LASONJA PORTER,               )     2:16-CV-01702 LEK
                              )
         Plaintiff,           )
                              )
     vs.                      )
                              )
SERGEANT MUNOZ in his         )
individual capacity, DOES 1-  )
10 in their individual        )
capacities, CITY OF DAVIS     )
POLICE DEPARTMENT, CITY OF    )
DAVIS,                        )
                              )
         Defendants.          )
_____ )


## ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

On August 1, 2018, Defendants Michael Munoz ("Munoz")
and the City of Davis[1] ("the City," collectively "Defendants")
filed their Motion for Summary Judgment ("Motion"). [Dkt.
no. 34.] Plaintiff Lasonja Porter ("Plaintiff") filed her
memorandum in opposition on September 5, 2018, and Defendants
filed their reply on September 11, 2018. [Dkt. nos. 36, 45.]
Plaintiff filed a supplemental memorandum in opposition on
October 4, 2018, and Defendants filed a supplemental reply on
October 11, 2018. [Dkt. nos. 45, 49.] The Court finds this
matter suitable for disposition without a hearing pursuant to
L.R. 230(g) of the Local Rules of the United States District

---

[1] Munoz is named in his individual capacity, and the City is
also named as the City of Davis Police Department ("Davis PD").
[Pltf.'s First Amended Complaint for Damages ("Amended
Complaint"), filed 2/6/17 (dkt. no. 14), at 1.]

1  Court for the Eastern District of California ("Local Rules").  On

2  October 18, 2018, this Court issued an entering order ruling on

3  the Motion.  [Dkt. no. 51.]  The instant Order supersedes that

4  entering order.  Defendants' Motion is hereby granted for the

5  reasons set forth below.

6  **<u>BACKGROUND</u>**

7      The instant case arises out of the February 26, 2016

8  search of the residence that Plaintiff shares with her son,

9  non-party Cairo Jones ("Jones"), and one of her other children.

10  The parties agree that, at the time of the search, Munoz was a

11  Lieutenant with the Davis PD.  On February 25, 2016, Munoz began

12  working on the investigation of a residential burglary and

13  battery.  [Defs.' Separate Statement of Undisputed Material Facts

14  in Supp. of Summary Judgment ("Defs.' SOF"), filed 9/5/18 (dkt.

15  no. 37), at ¶¶ 1-2; Mem. in Opp., Pltf.'s Response to Def.'s

16  [sic] Separate Statement of Undisputed Facts ("Pltf.'s SOF") at

17  ¶¶ 1-2 (admitting Defs.' ¶¶ 1-2).]  According to Munoz, Jones was

18  a possible suspect in the investigation because the victim made a

19  positive identification of Julio Meneses ("Meneses"), a known

20  associate of Jones's, and Jones matched another description given

21  by the victim.  [Motion, Evidence in Supp. of Defs.' Motion for

22  Summary Judgment ("Motion Evidence"), Exh. 1 (Decl. of Michael

2

Munoz in Supp. of Defs.' Motion for Summary Judgment ("Munoz Decl.")) at ¶ 3.[2]]

At the time of the incident, Jones was on probation for a 2014 conviction for larceny, conspiracy, and battery. Munoz confirmed that Jones's probation made him subject to search. [Defs.' SOF at ¶ 4; Pltf.'s SOF at ¶ 4.] Specifically,

> Munoz confirmed that the terms and conditions of Cairo Jones' court-imposed probation included, inter alia, that he: (1) "not violate any city or county ordinance or state or federal law or court order"; (2) "submit person, property or place of residence to search by the Probation Officer or any peace officer at any time of the day or night without a search warrant"; and (3) "not associate with Julio M."

[Defs.' SOF at ¶ 5; Pltf.'s SOF at ¶ 5.] He also confirmed the Davis address where Jones resided with Plaintiff. [Defs.' SOF at

---

[2] Plaintiff objects to this statement, arguing "[n]o admissible evidence has been cited to support this factual assertion." [Pltf.'s SOF at ¶ 3.] However, Munoz's declaration, signed "under penalty of perjury," [Munoz Decl. at pg. 4,] is admissible evidence of Munoz's reasons for the actions he took on the day in question. See Fed. R. Civ. P. 56(c)(4) ("An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."). Further, Plaintiff has not identified any evidence showing there is a genuine dispute of fact as to whether Jones matched the victim's description or as to whether Munoz had other reasons for his actions. See Rule 56(c)(1)(A) ("A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials"). Thus, Plaintiff's objection is overruled, and this Court will consider Munoz's statement.

¶¶ 6, 15; Pltf.'s SOF at ¶¶ 6, 15.] In light of the terms of Jones's probation, Munoz did not obtain a search warrant. [Defs.' SOF at ¶ 8; Pltf.'s SOF at ¶ 8.] Plaintiff acknowledges that, at the time of the relevant events in this case, she was aware of Jones's probation status and that their residence was subject to a warrantless probation search. [Defs.' SOF at ¶ 27; Pltf.'s SOF at ¶ 27.]

On February 26, 2016, Munoz and Davis PD Detectives Bellamy, Helton, and Infante went to Jones's and Plaintiff's residence to conduct a search to determine whether Jones violated the terms of his probation by associating with Meneses. [Defs.' SOF at ¶ 7; Pltf.'s SOF at ¶ 7.] Detective Helton wore a body-camera that recorded the search. [Defs.' SOF at ¶ 10; Pltf.'s SOF at ¶ 10.] The recording was shown to Plaintiff during her deposition, and she confirmed that it shows the February 26, 2016 search of her residence. [Defs.' SOF at ¶ 13; Pltf.'s SOF at ¶ 13.] Defendants submitted a DVD containing a copy of the recording, which is split into two digital files,[3] with the Motion. [Motion, Notice of Lodging Video Recordings in Supp. of Motion (dkt. no. 34-3); Notice of Lodging Document in Paper, filed 10/18/18 (dkt. no. 53) (replacement DVD).]

---

[3] The larger file, which is approximately twenty minutes of video footage, will be referred to as "File 1," and the smaller file, which is approximately six minutes of video footage that follows the footage in File 1, will be referred to as "File 2."

Munoz asserts that, at the time of the search, he "had information that a 2005 investigation led to the discovery of an illegal 'sawed-off' shotgun at this residence and a 2014 investigation led to the discovery of an illegal MAC-10 'sub-machine gun' assault weapon in one of the bedrooms"; and this meant that the residence posed an "increased safety risk." [Munoz Decl. at ¶¶ 9, 16.[4]]

Once at Jones's residence, Munoz knocked on the front door and waited approximately twenty seconds, but there was no response. [Defs.' SOF at ¶ 14; Pltf.'s SOF at ¶ 14.] He then called out through an open window next to the front door: "Hey Lasonja, this is Davis P.D." [Defs.' SOF at ¶ 16 (internal quotation marks omitted); Pltf.'s SOF at ¶ 16.] After approximately twenty more seconds, Plaintiff responded from inside: "Yeah, what do you want?" [Defs.' SOF at ¶ 17 (internal quotation marks omitted); Pltf.'s SOF at ¶ 17.] Munoz said they were there for a compliance check and asked if Jones was home. Plaintiff said that Jones was not, and she said she was not dressed. [Defs.' SOF at ¶¶ 18-19; Pltf.'s SOF at ¶¶ 18-19.] However, Munoz did not know whether Plaintiff was in fact the

[4] Plaintiff objects to these statements, again asserting the lack of admissible evidence supporting the Munoz Declaration. [Pltf.'s SOF at ¶¶ 9, 44.] For the same reasons as stated *supra* note 3, Plaintiff's objections are overruled, and this Court will consider Munoz's testimony.

1   only person in the residence.  [Defs.' SOF at ¶ 40; Pltf.'s SOF

2   at ¶ 40.]

3          Still talking through the window, Munoz asked Plaintiff

4   if she would be willing to get dressed.  [Defs.' SOF at ¶ 0;

5   Pltf.'s SOF at ¶ 20.]  Plaintiff responded, "not really, because

6   I'm sick, what's going on?"  [Defs.' SOF at ¶ 21 (internal

7   quotation marks omitted); Pltf.'s SOF at ¶ 21.]  Munoz repeated

8   that they were there for a compliance check.  Munoz also asked

9   Plaintiff if she had seen Meneses, but Plaintiff said she had

10  not.  Munoz again asked Plaintiff to get dressed so that they

11  could conduct the compliance check.  Plaintiff told him to wait

12  because she had to get dressed and she only had the use of one

13  arm.[5]  [Defs.' SOF at ¶¶ 22-25; Pltf.'s SOF at ¶¶ 22-25.]  Munoz

14  said "ok" and continued to wait outside until Plaintiff opened

15  the door approximately five minutes later.  [Defs.' SOF at ¶ 26;

16  Pltf.'s SOF at ¶ 26.]  She again asked what they were there for,

17  and Munoz repeated that they were checking to see if Jones was in

18  compliance with the terms of his probation.  Munoz and other

19  Davis PD detectives entered the residence.  [Defs.' SOF at ¶¶ 28-

---

20          [5] Plaintiff states her left arm was injured at the time of
21  the incident.  [Mem. in Opp., Pltf.'s Decl. in Supp. of Pltf.'s
22  Opp. ("Pltf. Decl.") at ¶¶ 10, 14.]  She originally injured her
23  shoulder at work and alleges the injury was aggravated during
24  this incident.  [Motion Evidence, Exh. 2 (Decl. of Derick E. Konz
25  in Supp. of Defs.' Motion for Summary Judgment ("Konz Decl.")),
26  Exh. C (excerpt of 1/8/18 trans. of Plaintiff ("Pltf. Depo.")) at
27  164.]

6

1    30; Pltf.'s SOF at ¶¶ 28-30.]  Munoz told Plaintiff, "no" several

2    times, and instructed her to "step aside."  [DVD, File 1 at 8:00-

3    8:02.]  Immediately thereafter, Plaintiff says: "Don't touch me.

4    I told you about that last time.  Don't freakin' touch me."  [Id.

5    at 8:03-8:06.]  During this exchange, Plaintiff and Munoz are not

6    visible on the video footage because they were inside the

7    doorway, while Detective Helton and the body camera were still

8    outside.

9         Defendants contend that Plaintiff was trying to block

10   the officers' path by walking in front of them and refusing to

11   get out of the way.  [Defs.' SOF at ¶¶ 31-32.]  Munoz told

12   Plaintiff to "stop" multiple times, but she continued to walk in

13   front of them, through the living room and towards the hallway

14   leading to the bedrooms.  [DVD, File 1 at 8:07-8:10.]  However,

15   according to Plaintiff, there was limited available space because

16   of the layout of the furniture, and she had to walk further into

17   the residence in order to get to an area where she could step to

18   the side and allow the officers to pass.  [Pltf. Decl. at ¶¶ 18-

19   20.]

20        As Plaintiff walked towards the hallway, Munoz told her

21   "stop" a number of times, but she did not comply.  Also during

22   that time, Plaintiff told the officers that she was going to her

23   room, but Munoz told her: "No, you're not."  After that, Munoz

24   can be seen reaching his left hand towards Plaintiff's left arm

and then swinging his arm back toward the living room.  Pointing,
Munoz says: "C'mon over here."  Plaintiff responds:  "Don't touch
my sore arm. . . .  Hold on.  Check this out.  If you touch my
freakin' arm again, so help me.  You understand?  I'm goin' to my
freakin' room.  Okay?"  [DVD, File 1 at 8:06-8:21.]  When this
interaction occurred, Munoz and Plaintiff were at the front of
the hallway that led to the bedrooms.

Defendants argue Munoz touched Plaintiff's arm for less
than a second when he was ordering her to return to the living
room ("Hallway Contact").  [Defs.' SOF at ¶ 35.]  However, in her
description of the Hallway Contact, Plaintiff states Munoz
"grabbed" her, and that "[h]is touching of [her] again cause[d]
her] great pain."  [Pltf. Decl. at ¶ 24.]  Plaintiff argues the
Hallway Contact "caus[ed] her to spin around."  [Pltf.'s SOF at
¶ 35.]  Defendants contend the Hallway Contact is the only
support for Plaintiff's claim that Munoz used excessive force,
[Defs.' SOF at ¶ 37,] but Plaintiff argues Munoz grabbed her
twice, [Pltf.'s SOF at ¶ 37].

After the Hallway Contact, Munoz moved past Plaintiff
in the hall in such a way that he did not touch her.  Munoz and
Detective Bellamy ordered Plaintiff to go back to the living
room, but she refused to do so.  [Defs.' SOF at ¶¶ 38-39; Pltf.'s
SOF at ¶¶ 38-39.]  Plaintiff yelled at Munoz, "you don't tell me
what to do!"  [Defs.' SOF at ¶ 39 (internal quotation marks

omitted); Pltf.'s SOF at ¶ 39.]  Because Jones lived there, and

his whereabouts were unknown, Munoz suspected that Jones may have

been in one of the bedrooms.  Further, because Meneses had not

been found, and he was a known associate of Jones, Munoz

suspected that Meneses may also have been in one of the bedrooms.

These suspicions were also based on the fact that Plaintiff

appeared to be trying to stall the search and/or obstruct him

from conducting the search.  [Munoz Decl. at ¶¶ 13-15.]  The

officers asked Plaintiff numerous times which room was Jones's.

Plaintiff accused Munoz of being "dirty," and she yelled, "get

out of my way . . . don't go in my son's room . . . don't go in

my baby's room . . . don't go in my room."  [DVD, File 1 at 8:55-

9:25.]  It was not clear during that time which rooms she was

referring to because she points in multiple directions.  [Id.]

However, Plaintiff states that, as Munoz started to search her

bedroom, she stated that he was entering her room.  She also

pointed out which room was Jones's and which belonged to her

other son, who also lived with her.  [Pltf. Decl. at ¶¶ 27-28.]

The parties agree that, at some point, while she was screaming,

Plaintiff indicated which was Jones's room.  [Defs.' SOF at ¶ 47;

Pltf.'s SOF at ¶ 47.]  Munoz states he "briefly looked in the

bedrooms to try and locate" Jones and Meneses and to determine

what rooms Jones may have had shared control over.  [Munoz Decl.

at ¶ 17.]  According to Munoz, the "brief look lasted no more

than a few seconds." [Id. at ¶ 18.]  After Munoz determined

which room Jones had control over and he determined there were no

other persons in the residence, he performed the probation

compliance check on Jones's bedroom only.  [Id. at ¶¶ 19-21.]  In

contrast, Plaintiff claims that, after she had been in the living

room for five minutes, she noticed Munoz in her room.  [Pltf.

Decl. at ¶ 34.]

       According to Plaintiff, she started to have a panic

attack after seeing Munoz go into her room and her other son's

room.  [Pltf. Decl. at ¶ 30.]  In the living room, Plaintiff said

she needed her medicine from her room and that she wanted to get

it.  Detective Bellamy told her he did not want her going back

down the hallway, but they would get the medicine for her.

[Defs.' SOF at ¶¶ 57-58; Pltf.'s SOF at ¶¶ 57-58.]  Detective

Bellamy retrieved Plaintiff's purse, which contained her

medicine, and gave it to her.  Detective Helton asked Plaintiff

if she wanted them to call an ambulance for her, but she refused.

[Defs.' SOF at ¶¶ 60-61; Pltf.'s SOF at ¶¶ 60-61.]  Detective

Helton also asked Plaintiff if she needed anything for the pain

in her arm, but she did not respond.  [Defs.' SOF at ¶ 68;

Pltf.'s SOF at ¶ 68.]  Plaintiff did not seek any treatment for

the injury she alleges she suffered as a result of the incident;

she merely took more Xanax, which she had already been taking

before the incident.  She has no documentation of any medical

10

bills related to the incident, and does not remember if she went to physical therapy as a result of the incident. [Defs.' SOF at ¶¶ 71-72; Pltf.'s SOF at ¶¶ 71-72.]

Plaintiff originally filed this action on July 22, 2016. [Complaint for Damages (dkt. no. 1).] The operative pleading is Plaintiff's First Amended Complaint for Damages ("Amended Complaint"), [filed 2/6/17 (dkt. no. 14),] which alleges the following claims: a 42 U.S.C. § 1983 claim against Munoz alleging that his unreasonable use of force violated Plaintiff's Fourteenth Amendment right to substantive due process ("Count I"); a § 1983 claim against Munoz alleging that his unreasonable search violated Plaintiff's Fourth Amendment rights ("Count II"); a claim under the Tom Bane Civil Rights Act ("Bane Act"), California Civil Code § 52.1, against Defendants ("Count III"); a negligence claim against Defendants based on the allegedly illegal search, pursuant to California Government Code § 815.2 ("Count IV"); an intentional infliction of emotional distress ("IIED") claim against Munoz ("Count V"); and a battery claim against Defendants ("Count VI").

Defendants' February 23, 2017 motion to dismiss the Amended Complaint was granted in part and denied in part in an order filed on August 22, 2017 ("8/22/17 Order"). [Dkt. nos. 14,

1    20.[6]]  Count IV was dismissed with prejudice, and all references

2    in Count I to the Fourteenth Amendment were stricken.  Thus,

3    Count I is construed as alleging a § 1983 claim based upon an

4    alleged use of excessive force, in violation of Plaintiff's

5    Fourth Amendment rights.  8/22/17 Order, 2017 WL 3601492, at *4.

6    In the instant Motion, Defendants seek summary judgment as to all

7    of the remaining claims against them.

8                              **DISCUSSION**

9    **I.   Count I - Excessive Force**

10            Count I alleges that Munoz used excessive force against

11   Plaintiff in performing the search of her residence.

12   "Allegations of excessive force are analyzed under the Fourth

13   Amendment's prohibition against unreasonable seizures.  Whether

14   the force used by an officer is unconstitutionally excessive is

15   determined by whether the officer's actions are objectively

16   reasonable in light of the facts and circumstances confronting

17   the officer."  Kinerson v. Spokane Cty., 714 F. App'x 764, 764-65

18   (9th Cir. 2018) (citing Graham v. Connor, 490 U.S. 386, 397, 109

19   S. Ct. 1865, 104 L. Ed. 2d 443 (1989)).  "To determine whether

20   the use of force was objectively reasonable, the court balances

21   the 'nature and quality of the intrusion on the individual's

22   Fourth Amendment interests against the countervailing

23   governmental interests at stake.'"  Vos v. City of Newport Beach,

_____

24            [6] The 8/22/17 Order is also available at 2017 WL 3601492.

892 F.3d 1024, 1030-31 (9th Cir. 2018) (quoting <u>Graham v. Connor</u>,

490 U.S. 386, 396, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989)),

*cert. pet. docketed*, No. 18-672 (Nov. 23, 2018).

A.    <u>**Nature and Quality of the Intrusion**</u>

"To evaluate the nature and quality of the intrusions

on plaintiffs' Fourth Amendment interests, we consider the type

and amount of force inflicted against them." <u>Felarca v.</u>

<u>Birgeneau</u>, 891 F.3d 809, 817 (9th Cir. 2018) (citation and

internal quotation marks omitted).

In response to Defendants' assertion that her excessive

force claim is based only on the Hallway Contact, Plaintiff

asserts Munoz grabbed her arm twice.[7] [Defs.' SOF at ¶ 37;

Pltf.'s SOF at ¶ 37 (denying Defs.' ¶ 37).] No contact between

Munoz and Plaintiff can be seen in the moments after Munoz

entered Plaintiff's residence because Detective Helton was still

_____

[7] Defendants filed excerpts of the transcript of Plaintiff's
deposition in support of the Motion. [Konz Decl., Exh. C.] They
also submitted a complete copy of the transcript pursuant to
Local Rule 133 ("Plaintiff Rule 133(j) Deposition"). The Court
notes that, during her deposition, Plaintiff was asked how many
times Munoz grabbed her arm, and she responded: "Just once. He
just grabbed me. And I got away from him." [Pltf. Rule 133(j)
Depo. at 219.] This Court has not considered any inconsistencies
between Plaintiff's deposition testimony and the other documents
Plaintiff submitted in opposition to the Motion because this
Court cannot rule upon credibility issues on summary judgment.
<u>See</u> <u>Eat Right Foods Ltd. v. Whole Foods Mkt., Inc.</u>, 880 F.3d
1109, 1118 (9th Cir. 2018) ("On summary judgment, 'the judge's
function is not himself to weigh the evidence and determine the
truth of the matter but to determine whether there is a genuine
issue for trial.'" (quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477
U.S. 242, 249, 106 S. Ct. 2505 (1986))).

outside.  However, Plaintiff can be heard telling Munoz: "Don't touch me.  I told you about that last time.  Don't freakin' touch me."  [DVD, File 1 at 8:03-8:06.]  Plaintiff also states that, "[a]fter [she] turned into [her] home," Munoz "unexpectedly grabbed" her injured left arm.  [Pltf. Decl. at ¶ 13.]  Viewing the record in the light most favorable to Plaintiff as the non-moving party,[8] this Court finds, for purposes of the instant Motion, that Munoz made contact with Plaintiff's arm shortly after walking through the doorway ("Doorway Contact").

Although neither the Doorway Contact nor the Hallway Contact can be seen in the video footage, it is clear from the timing of the interactions and the concurrent conversation that the contacts were brief.  Plaintiff asserts both the Doorway Contact and the Hallway Contact caused her "great pain."  [Pltf. Decl. at ¶¶ 15, 24.]  However, Plaintiff's comments to Munoz after each contact, while showing indignation that he touched her and that she had previously been experiencing pain in her arm, did not indicate that Munoz's contacts with her arm inflicted great pain upon her.  See DVD, File 1 at 8:03-8:20.  Further, Plaintiff concedes that she did not seek medical treatment for any injury from the incident; she merely took an anxiety

---

[8] In ruling on a motion for summary judgment, "the judge must view the evidence in the light most favorable to the nonmoving party and make all reasonable inferences in favor of that party."  Eat Right, 880 F.3d at 1118 (citing Tolan v. Cotton, 134 S. Ct. 1861, 1866-68 (2014) (per curiam)).

medication that she had already been taking prior to the
incident.  [Defs.' SOF at ¶ 71; Pltf.'s SOF at ¶ 71.]

In considering the Motion, this Court cannot make
credibility determinations or weigh evidence.  See Eat Right, 880
F.3d at 1118.  However, when the party opposing the motion for
summary judgment tells a version of the events that is "blatantly
contradicted by the record," that is not enough to create a
genuine issue of material fact and to preclude summary judgment.
See Scott v. Harris, 550 U.S. 372, 380 (2007) ("When opposing
parties tell two different stories, one of which is blatantly
contradicted by the record, so that no reasonable jury could
believe it, a court should not adopt that version of the facts
for purposes of ruling on a motion for summary judgment.").
Viewing the record in the light most favorable to Plaintiff, the
parties essentially present two conflicting versions of the
approximately thirty seconds during which both the Doorway
Contact and the Hallway Contact occurred.  This Court finds that
Plaintiff's story that Munoz grabbed her arm so forcefully as to
cause her great pain both times, and causing her to spin around
after the Hallway Contact, is blatantly contradicted by the video
recording – the authenticity of which Plaintiff does not dispute,
and this Court finds that no reasonable jury would believe
Plaintiff's story.  This Court therefore rejects Plaintiff's
description of the Doorway Contact and the Hallway Contact and

concludes that both contacts were minimal intrusions on Plaintiff's Fourth Amendment rights.

## B. __Governmental Interests__

The minimal intrusion on Plaintiff's rights must still be weighed against the strength of the governmental interests purportedly giving rise to the intrusion. In the context of the use of force during an arrest, the Ninth Circuit has stated:

> The strength of the government's interest is measured by examining three primary factors: (1) "the severity of the crime at issue," (2) "whether the suspect poses an immediate threat to the safety of the officers or others," and (3) "whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." [__A.K.H. ex rel. Landeros v. City of Tustin__, 837 F.3d 1005, 1011 (9th Cir. 2016).] "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." __Graham__, 490 U.S. at 396, 109 S. Ct. 1865. As explained below, on these facts, a reasonable jury could conclude that the government's interests were insufficient to justify the use of deadly force under these circumstances.

__Vos__, 892 F.3d at 1031 (some alterations in __Vos__).

First, at the time of the search, Munoz was investigating a residential burglary and battery. [Defs.' SOF at ¶ 2; Pltf.'s SOF at ¶ 2.] Munoz believed Jones to be a suspect because Meneses, a known associate of Jones's, was identified by the victim, and the victim described another person matching Jones's description. [Munoz Decl. at ¶ 3.] Further, the terms of Jones's probation allowed for a warrantless compliance search,

16

1   and it would have been a violation of the terms of Jones's

2   probation for him to have been associating with Meneses.  [Munoz

3   Decl., Exh. B (Superior Court of Cal., Cty. of Yolo - Order

4   Admitting Def. to Formal Probation, <u>People v. Cairo Jones</u>, Case

5   # 14-2059, dated 8/26/14) at ¶ 19 (requiring the probationer to

6   "[s]ubmit person, property or place of residence to search by the

7   Probation Officer or any peace office at any time of the day or

8   night without a search warrant" (emphasis omitted)), ¶ 30

9   (stating the probationer must "[n]ot associate with . . .

10  Julio M.").]  Thus, this Court finds the first factor weighs in

11  favor of a finding that the force used was reasonable to

12  accomplish the search.

13      As to the second factor, there was no indication that

14  Plaintiff presented an immediate threat to the officers' safety

15  or to the safety of others.  Although the officers may have

16  believed it was possible that Jones and Meneses were in the

17  residence, Plaintiff was the only person present when Munoz used

18  force against her.  Even if Jones and Meneses had been in the

19  residence at the time of the search, they were not a threat to

20  anyone's safety at the time of the use of force.  Thus, the

21  second factor weighs against a finding that the force used was

22  reasonable.

23      Third, from the perspective of a reasonable officer in

24  Munoz's position, Plaintiff was actively trying to delay or

resist the search.  After Munoz concludes his explanation to
Plaintiff about the reason for their presence and Plaintiff
responds that they need to wait while she gets dressed, more than
three minutes pass before Plaintiff again calls something out
from inside and Munoz responds, "okay."  [DVD, File 1 at 2:21-
5:48.]  Approximately two more minutes pass before Plaintiff
opens the door.  [Id. at 5:48-7:52.]  Even after Plaintiff opens
her door, she appears to try to prevent, verbally and physically,
the officers' entrance through the doorway, as well as their
passage down the hallway to the bedrooms.  [Id. at 7:59-8:20.]
Thus, this Court finds the third factor weighs in favor of a
finding that the force used was reasonable to accomplish the
search.

        Considering these three factors as a whole, this Court
finds that the governmental interests in conducting the search
outweigh the minimal intrusion upon Plaintiff's rights.
Addressing a similar excessive force claim, this district court
stated:

            "Not every push or shove, even if it may
        later seem unnecessary in the peace of a judge's
        chambers, violates the Fourth Amendment."  Graham,
        490 U.S. at 396 (internal quotations and citation
        omitted).  Where the amount of force used was de
        minimis in light of the asserted government
        interest, an excessive force claim may be invalid
        as a matter of law.  Nakamura v. City of Hermosa
        Beach, 2009 WL 1445400, *11 (C.D. Cal. 2009)
        (force used was de minimis where, during the
        course of arrest, officer told plaintiff to sit
        down and simultaneously put his right hand on

18

<blockquote>
Plaintiff's shoulder, shoving him to the ground;<br>
and "Plaintiff's buttocks made contact with the<br>
ground but [he] sustained no bruises or cuts").<br>
Here, Plaintiff's only allegation is that an<br>
unnamed officer grabbed her elbow to prevent her<br>
from blocking the door to the house.  She<br>
sustained no injury.  This use of force, if it<br>
occurred, was both <em>de minimis</em> and reasonable under<br>
the circumstances.  The officer justifiably<br>
entered the home without a warrant and was<br>
entitled to ensure that his entry was not<br>
blocked. . . .
</blockquote>

<u>Anderson v. Smith</u>, No. 1:06-CV-1795 OWW SMS, 2009 WL 2139311, at

*17 (E.D. Cal. July 10, 2009) (alteration in <u>Anderson</u>).  For the

reasons set forth above, this Court finds that both of Munoz's

contacts with Plaintiff were <em>de minimis</em> and reasonable under the

circumstances.  Plaintiff's excessive force claim against Munoz

therefore fails as a matter of law, and this Court concludes that

Munoz's contacts with Plaintiff did not violate her Fourth

Amendment rights.  The Motion is granted insofar as summary

judgment is granted in favor of Munoz as to Count I.

**II.  <u>Count II - Unreasonable Search</u>**

Count II alleges that Munoz's search of Plaintiff's

residence was unreasonable and a violation of her Fourth

Amendment rights.  As previously noted, the terms of Jones's

probation required him to submit to warrantless searches of his

residence.  [Munoz Decl., Exh. B at ¶ 19.]  However, the Ninth

Circuit has stated:

<blockquote>
[A] probationer's acceptance of a search term in a<br>
probation agreement does not by itself render<br>
lawful an otherwise unconstitutional search of a
</blockquote>

probationer's person or property.  In United
States v. Consuelo-Gonzalez, 521 F.2d 259, 261
(9th Cir. 1975) (en banc), we held that
probationers do not entirely waive their Fourth
Amendment rights by agreeing, as a condition of
their probation, to "submit [their] person and
property to search at any time upon request by a
law enforcement officer."  We explained that there
is a limit on the price the government may exact
in return for granting probation.  Id. at 265.
Specifically, "any search made pursuant to the
condition included in the terms of probation must
necessarily meet the Fourth Amendment's standard
of reasonableness." Id. at 262; see United States
v. Scott, 450 F.3d 863, 868 (9th Cir. 2006)
(confirming this reading of Consuelo-Gonzalez's
holding).

United States v. Lara, 815 F.3d 605, 609 (9th Cir. 2016) (some

alterations in Lara).

When determining whether a warrantless probation search

that affected the rights of a third-party was reasonable, a court

within the Ninth Circuit must consider "the totality of the

circumstances." Smith v. City of Santa Clara, 876 F.3d 987, 994

(9th Cir. 2017) (citing United States v. Knights, 534 U.S. 112,

118-19, 122 S. Ct. 587 (2001)), cert. denied, 138 S. Ct. 1563

(2018).  To determine whether a search was reasonable under the

totality of the circumstances, a court must

balance the degree to which the search intrudes
upon the third party's privacy against the degree
to which the search is needed for the promotion of
legitimate governmental interests. [Knights, 534
U.S.] at 119, 122 S. Ct. 587.  A non-probationer,
of course, has a higher expectation of privacy
than someone who is on probation, and therefore

1          the privacy interest in this case is greater than
2          it would be if the search affected only the
3          probationer. . . .
4
5    _Id._

6          As previously noted, Munoz states that: he looked in

7    the bedrooms for no more than a few seconds to determine if

8    Jones, Meneses, or anyone else was in the residence and to

9    determine which rooms Jones had control over; and his subsequent

10   probation search only involved Jones's room, not the other

11   bedrooms.  [Munoz Decl. at ¶¶ 17-21.]  Plaintiff has submitted

12   contrary evidence.  She states that, before she went into the

13   living room, she saw Munoz go into her room and her other son's

14   room.  [Pltf. Decl. at ¶¶ 30-31.]  Plaintiff also states that,

15   approximately five minutes after she went into the living room,

16   she "noticed that Seargent [sic] Munoz was in [her] room."  [_Id._

17   at ¶ 34.]  According to Plaintiff, during the officer's search of

18   her residence, the lock for her file cabinet was "completely

19   removed from the filing cabinet."  [_Id._ at ¶¶ 39-40.]  During her

20   deposition, Plaintiff testified that she believes the file

21   cabinet lock is broken, but, although the file cabinet is still

22   part of her furniture and she "love[s] it," she never tried to

23   have the lock reinstalled.  [Pltf. Depo. at 190-91.]

24         It is not clear from the video footage how many times

25   and how long Munoz looked into or entered the bedrooms other than

26   Jones's.  Munoz, Bellamy, and Plaintiff can be seen in the

hallway, while Helton remains at the front of the hallway.
Because Plaintiff and Bellamy are in front of Helton, the view of
the bedroom doors is obscured during much of the footage.  At
times, Munoz can be seen looking into, walking into, and walking
out of, some of the rooms.  [DVD, File 1 at 8:30-11:42.]  After
that, Plaintiff goes into the living room with one of the
officers.  Helton remains either at the front of the hallway or
in the living room, with the camera turned towards the living
room.  [Id. at 11:43 to 19:54 (end).]  After Jones and
Plaintiff's mother arrived at the residence, Helton's position in
the living room temporarily allows the hallway and bedroom
doorways to be seen, but Munoz is not visible during that time.
[DVD, File 2 at 0:00-1:33.]  After that, the doorways are not
visible until one of the officers asks Helton to do a video sweep
to document the condition of Jones's room.  Helton does so, and
then all of the officers leave the residence.  [Id. at 4:30-
6:00.]

Viewing the evidence in the light most favorable to
Plaintiff, and being mindful of the fact that this Court cannot
make credibility determinations on summary judgment, this Court
will assume that Munoz entered bedrooms other than Jones's
multiple times during the incident and that he was in those rooms
for longer than a few seconds each.  However, even viewing the
evidence in the light most favorable to Plaintiff, the record

does not support Plaintiff's position that Munoz broke her file cabinet at some point during the incident. Plaintiff testified during her deposition that she spoke to a friend on the day of the incident, and she told her friend that Munoz broke her file cabinet. [Pltf. Rule 133(j) Depo. at 119-20.] However, there is no evidence in the record that Munoz broke the file cabinet. It is not clear from either the official record or the Plaintiff Rule 133(j) Deposition where the file cabinet was located in the residence. Based on Plaintiff's statements that only she had access to the file cabinet and that she and her sons each had separate bedrooms, which they did not share, [Pltf. Decl. at ¶¶ 6, 42,] the file cabinet may have been in Plaintiff's bedroom. At least twice, Plaintiff gave one of the officers (other than Munoz) permission to go into her room to retrieve items for her, and they did so.[9] [DVD, File 1 at 12:35-13:40, 16:28-58.] Even if this Court found there was a genuine issue of fact as to who broke the file cabinet, the issue would not preclude summary judgment because the resolution of the issue would not affect the outcome of Count II. See Eat Right, 880 F.3d at 1118 ("A material fact is one 'that might affect the outcome of the suit under the governing law.' (quoting Anderson v. Liberty Lobby, 477 U.S. at 248, 106 S. Ct. 2505)).

---

[9] None of the three other officers present during the search are named as a defendant in this case.

23

1    Even if Munoz broke the file cabinet lock during his

2    search of rooms other than Jones's, this Court would conclude

3    that the manner in which Munoz conducted the search was

4    reasonable under the totality of the circumstances.  As

5    previously noted: 1) at the time of the search, Munoz was

6    investigating a residential burglary and battery in which Jones

7    and Meneses were suspects; [Defs.' SOF at ¶ 2; Pltf.'s SOF at

8    ¶ 2; Munoz Decl. at ¶ 3;] 2) Munoz was aware that, in two prior

9    investigations, a gun was found at Plaintiff's residence; [Munoz

10   Decl. at ¶ 9;] and 3) Plaintiff appeared to be trying to delay or

11   resist the search, [DVD, File 1 at 2:21-7:52, 7:59-8:20].

12   In addition, Plaintiff made statements suggesting that

13   Jones no longer lived with her.  [Id. at 9:37-9:38 ("Cairo ain't

14   livin' here no [expletive] more"); id. at 13:33-13:27 (Plaintiff

15   stating she is the only one who has been there because she is

16   redoing the residence).]  Further Plaintiff did not respond when

17   one of the officers told her that Jones had to inform the

18   probation office if he no longer lived there.  [Id. at 12:24-

19   12:30.]  Finally, when Plaintiff was asked to confirm that Jones

20   was no longer living in the residence, she claimed she did not

21   say that, and claimed that what she actually said was that Jones

22   was not going to be living there in the future because she did

23   not want people like the Davis PD in her home.  [Id. at 14:48-

24   14:54.]

1    Plaintiff also did not clearly identify which of the
2    rooms was Jones's when Munoz and Bellamy asked her to identify
3    Jones's room.  She was continuously shouting at Munoz and
4    pointing to different rooms.  She told Munoz not to go into her
5    room, her "son's room," and her "baby's room."  [Id. at 8:50-
6    9:30.]  Plaintiff herself acknowledges she was attempting to
7    point out which room was Jones's and which was her youngest
8    son's.  [Pltf. Decl. at ¶ 28.]  There is no evidence that Munoz
9    knew or should have known that Plaintiff's references to her
10   "son" meant Jones and her references to her "baby" did not refer
11   to Jones.  Further, it was reasonable for Munoz to enter the
12   rooms to determine whether anyone else was in the residence.   See
13   DVD, File 1 at 9:31-9:33.  Plaintiff states the bedrooms in her
14   residence "are small and do not have a walk-in closets [sic],"
15   [Pltf. Decl. at ¶ 4,] implying that it was unnecessary for Munoz
16   to enter the rooms to determine whether someone was inside.
17   However, Plaintiff's statement alone is not evidence that: 1) it
18   would have been impossible for a person to hide in one of the
19   closets; and 2) Munoz knew or should have known it was impossible
20   for a person to be hiding in one of the closets.

21      Having considered the totality of the circumstances,
22   this Court concludes that the intrusion upon Plaintiff's privacy
23   was minimal and was outweighed by the legitimate governmental
24   interests behind Munoz's search of Plaintiff's residence.   Thus,

Munoz's search was reasonable under the totality of the circumstances.  This Court concludes that Plaintiff's unreasonable search claim fails as a matter of law and that the search did not violate her Fourth Amendment rights.  The Motion is granted insofar as this Court grants summary judgment in favor of Munoz as to Count II.

**III.  Count III - Bane Act Claim**

Plaintiff also asserts a Bane Act claim against Munoz and against the City, based on the doctrine of *respondeat superior*.  [Amended Complaint at pg. 8.]  "The Bane Act provides a state law remedy for constitutional or statutory violations accomplished through intimidation, coercion, or threats."  8/22/17 Order, 2017 WL 3601492, at *2 (citations and internal quotation marks omitted).  "[A] defendant is liable [for a violation of the Bane Act] if he or she interfered with the plaintiff's constitutional rights by the requisite threats, intimidation, or coercion."  <u>Id.</u> (citations and internal quotation marks omitted).  Because this Court has concluded that Munoz did not violate Plaintiff's constitutional rights, Plaintiff's Bane Act claim against Munoz also fails as a matter of law.  In light of this ruling, it is not necessary for this Court to address whether the City is liable for Munoz's actions based on *respondeat superior*.  The Motion is therefore granted

26

1  insofar as this Court grants summary judgment in favor of

2  Defendants as to Count III.

3  **IV.  <u>Count V - IIED Claim</u>**

4          Plaintiff also asserts an IIED claim against Munoz.

5          Under California law, "[a] cause of action for
6          intentional infliction of emotional distress
7          exists when there is (1) extreme and outrageous
8          conduct by the defendant with the intention of
9          causing, or reckless disregard of the probability
10         of causing, emotional distress; (2) the
11         plaintiff's suffering severe or extreme emotional
12         distress; and (3) actual and proximate causation
13         of the emotional distress by the defendant's
14         outrageous conduct." <u>Hughes v. Pair</u>, 46 Cal. 4th
15         1035, 1050, 95 Cal. Rptr. 3d 636, 209 P.3d 963
16         (2009).
17
18  <u>Ravel v. Hewlett-Packard Enter., Inc.</u>, 228 F. Supp. 3d 1086, 1099

19  (E.D. Cal. 2017) (alteration in <u>Ravel</u>).  Regardless of whether

20  there are genuine issues as to whether Plaintiff's emotional

21  distress is severe or extreme or as to causation, the

22  outrageousness issue is dispositive here.

23         To be sufficiently extreme and outrageous conduct,
24         the actions alleged "must be so extreme as to
25         exceed all bounds of that usually tolerated in a
26         civilized community." <u>Cochran v. Cochran</u>, 65 Cal.
27         App. 4th 488, 494 (1998) (quotations omitted); <u>see</u>
28         <u>also</u> <u>Potter v. Firestone Tire & Rubber Co.</u>, 6 Cal.
29         4th 965, 1001 (1993); <u>Rangel v. Bridgestone Retail</u>
30         <u>Operations, LLC</u>, 200 F. Supp. 3d 1024, 1032 (C.D.
31         Cal. 2016).  While the court may, in certain
32         instances, conclude the specific conduct alleged
33         is insufficiently outrageous to sustain such a
34         claim as a matter of law, <u>see</u> <u>Davidson v. City of</u>
35         <u>Westminster</u>, 32 Cal. 3d 197, 210 (1982), this
36         element of the claim is commonly seen as a factual
37         issue.  <u>See</u> <u>Yun Hee So v. Sook Ja Shin</u>, 212 Cal.
38         App. 4th 652, 672 (2013) ("Thus, whether conduct
39         is 'outrageous' is usually a question of fact.");

Ragland v. U.S. Bank Nat'l Assoc., 209 Cal. App.
4th 182, 204 (2012) ("Whether conduct is
outrageous is usually a question of fact.");
Spinks v. Equity Residential Briarwood Apts., 171
Cal. App. 4th 1004, 1045 (2009) ("In the usual
case, outrageousness is a question of fact.");
Hawkins v. Bank of America N.A.,
No. 2:16-cv-00827-MCE-CKD, 2017 WL 590253, at *
[sic] (E.D. Cal. Feb. 14, 2017).

Morse v. Cty. of Merced, No. 1:16-cv-00142-DAD-SKO, 2017 WL

2958733, at *18 (E.D. Cal. July 11, 2017).

In light of the discussion *supra* of Munoz's conduct

during the incident and this Court's prior rulings, this Court

concludes that, as a matter of law, Munoz's conduct was

"insufficiently outrageous to sustain" an IIED claim.   See

Davidson, 32 Cal. 3d at 210.   Moreover, this Court finds that

Plaintiff has failed to present any evidence that Munoz intended

to cause, or recklessly disregarded the possibility of causing,

Plaintiff emotional distress.   See Hughes, 46 Cal. 4th at 1050.

Munoz had a legitimate reason for the Doorway Contact and the

Hallway Contact – to get past Plaintiff to conduct the search.

Further, there is no evidence that Munoz knew or should have

known that his minimal contact with Plaintiff's arm would cause

her great pain.   Although Plaintiff had stated she had an

arm/shoulder injury, there were no visible signs that would have

put Munoz on notice that Plaintiff's injury was so severe that

even minimal contact with her arm would cause Plaintiff great

pain, which would in turn cause her emotional distress.   Even

Plaintiff's mother did not realize this.  When Plaintiff's mother

arrived at the residence and learned about the situation, she put

her hand on Plaintiff's shoulder to try to calm Plaintiff down.

If Plaintiff's mother did not realize minimal contact with

Plaintiff's shoulder/arm would cause Plaintiff pain, neither

would Munoz have realized that fact.  In addition, after her

mother touched her shoulder, Plaintiff immediately cried out:

"Ow, Mom, my shoulder!  Mom, my shoulder!"  [DVD, File 2 at 2:44-

2:48.]  Plaintiff did not make such an outcry after either the

Doorway Contact or the Hallway Contact.  Thus, there is no

evidence suggesting that, when Munoz touched Plaintiff's arm, he

intended to cause, or recklessly disregarded the possibility of

causing, Plaintiff physical pain, which he knew or should have

known would lead to emotional distress.

Plaintiff has failed to establish the severity

requirement and the intent requirement of the outrageousness

element of her IIED claim, and the claim therefore fails as a

matter of law.  The Motion is granted insofar as this Court

grants summary judgment in favor of Munoz as to Count V.

**V.    Count VI - Battery Claim**

Plaintiff's final claim is a battery claim against

Munoz and against the City, based upon *respondeat superior*.

[Amended Complaint at pg. 11.]

A civil battery is "an offensive and
intentional touching without the victim's

consent." <u>Kaplan v. Mamelak</u>, 162 Cal. App. 4th
637, 645, 75 Cal. Rptr. 3d 861 (2008).  The
elements of a civil battery under California law
are: (1) defendant touched plaintiff, or caused
plaintiff to be touched, with the intent to harm
or offend plaintiff; (2) plaintiff did not consent
to the touching; (3) plaintiff was harmed or
offended by defendant's conduct; and (4) a
reasonable person in plaintiff's position would
have been offended by the touching.  <u>So v. Shin</u>,
212 Cal. App. 4th 652, 669, 151 Cal. Rptr. 3d 257
(2013).

[Order Granting in Part and Denying in Part Defs.' Motion to

Dismiss and to Strike, filed 1/23/17 (dkt. no. 13) ("1/23/17

Order"), at 7 (some citations omitted).[10]]  For the reasons

discussed as to the intent requirement for Plaintiff's IIED

claim, this Court also concludes that Plaintiff has not

established that Munoz touched Plaintiff with the intent to harm

or offend her.  <u>See So</u>, 212 Cal. App. 4th at 669.  Further, in

light of this Court's ruling that Munoz's contacts with Plaintiff

were *de minimis* and reasonable under the circumstances, this

Court also finds that a reasonable person in Plaintiff's position

would not have been offended by the contact.  Because Plaintiff

has failed to establish these required elements of her battery

claim against Munoz, the claim fails as a matter of law.  In

light of this ruling, it is not necessary for this Court to

address whether the City is liable for Munoz's actions based on

*respondeat superior*.  The Motion is therefore granted insofar as

---

[10] The 1/23/17 Order is also available at 2017 WL 282591.

this Court grants summary judgment in favor of Defendants as to Count VI.

**VI.  Other Issues**

This Court has granted summary judgment to Defendants as to all of Plaintiff's claims against them.  It is therefore unnecessary for this Court to address the arguments in the Motion regarding any defenses to liability, including Munoz's immunity defenses.  Any other argument not expressly addressed in the instant Order is rejected as unnecessary to the disposition of Plaintiff's claims.

**CONCLUSION**

On the basis of the foregoing, Defendants' Motion for Summary Judgment, filed August 1, 2018, is HEREBY GRANTED.  There being no remaining claims in this case, the Clerk's Office is DIRECTED to enter final judgment in favor of Defendants and to close the case immediately.

IT IS SO ORDERED.

DATED AT HONOLULU, HAWAII, February 1, 2019.



 /s/ Leslie E. Kobayashi 
Leslie E. Kobayashi
United States District Judge

**LASONJA PORTER VS. SERGEANT MUNOZ, ET AL.; 2:16-cv-01702 LEK; ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**